## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| **POWER HOME SOLAR, LLC d/b/a PINK ENERGY** | **Case No. 22-50228** |
| EIN:  30-0839854 | |
| Debtor(s). | |

### MOTION (A) FOR APPROVAL OF CARVE-OUT AGREEMENT WITH JPMORGAN CHASE, N.A., ET AL., FOR LIQUIDATION OF THE DEBTOR'S ASSETS; (B) FOR APPROVAL OF AUCTION MARKETING AGREEMENT; AND (C) TO SELL ASSETS FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES, CLAIMS AND INTERESTS

NOW COMES Jimmy R. Summerlin, Jr., Trustee for the estate of the above captioned Chapter 7 bankruptcy (the "Trustee"), and requests the Court enter an order approving that certain carve-out agreement with JPMorgan Chase, N.A., approving that certain Auction Marking Agreement with Iron Horse Auction Company, Inc., and authorizing the Trustee to sell the Debtor's assets free and clear of any and all liens, encumbrances and interests.  In support of the relief requested, the Trustee asserts the following:

### JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The

statutory predicates for the relief requested herein are sections 105(a), 363(b), 363(f) and 363(m)

of Title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rule 6004.

## BACKGROUND

2.      On October 7, 2022 (the "Petition Date"), the Debtor filed for protection under

Chapter 7 of the United States Bankruptcy Code.

3.      The Debtor was organized in 2014 under the laws of the State of Delaware and,

upon information and belief, conducted business from 2014 until the Petition Date.

4.      Prior to the Petition Date, the Debtor was engaged in the business of sales,

installation, and service of solar panel systems and other related equipment and services.  The

Debtor's principal office was located in Mooresville, North Carolina.  Although most, if not all,

of the Debtor's satellite facilities are located east of the Mississippi River, the Debtor engaged in

business throughout the United States.

5.      The Debtor operated its business from in excess of 50 separate locations reaching

from Texas up to Michigan and east to the Atlantic coast, including at least 13 different states.

The Debtor's primary assets at each of these locations consist of vehicles, trailers, equipment,

inventory, electronics, office furniture, fixtures and other personal property (collectively, the

"Physical Assets").  Other assets used in the operation of the Debtor's business include certain

trademarks, website domains, and other intellectual property (collectively, the "IP Assets" and

together with the Physical Assets, the "Operating Assets").

6.      In addition to the Operating Assets, the Debtor holds certain claims against third-

parties, including specifically, but without limitation, a pending lawsuit against Generac Power

Systems, Inc., a pending lawsuit against Orbit Marketing, LLC, possible claims against the

Debtor's former officers and directors, and possible claims for federal, state, and/or local tax

refunds, including possible Employee Retention Tax Credits (collectively, the "Non-Operating Assets" and together with the Operating Assets, the "Debtor's Assets").

7.      The Operating Assets and the Non-Operating Assets comprise the bulk, if not all of the Debtor's assets.

8.      JPMorgan Chase, N.A., as administrative agent for a group of lenders under that certain Credit Agreement dated November 23, 2021 (the "Credit Agreement") asserts a claim against the Debtor in the aggregate amount of approximately $80,000,000.00.[1]  JPMorgan further asserts a first lien security interest in substantially all of the Debtor's Assets based upon certain pledge and security agreements dated November 23, 2021 and certain UCC financing statements filed in relation thereto.  If, as it asserts, JPMorgan's claim fully encumbers the Debtor's Assets, there would be little, if any benefit to the various creditors in this case by the Trustee's administration of the Debtor's Assets, as all such funds derived would be payable to JPMorgan, up to the full amount of its claim.

9.      Based upon the above, the Trustee has negotiated with JPMorgan to provide certain carve-outs to the Debtor's estate for the purposes of providing for the orderly liquidation of the Operating Assets, the pursuit and hopeful recovery on the Non-Operating Assets, that the Trustee expects and anticipates will be of significant benefit to the Debtor's estate and its numerous creditors.

10.     Based upon the Trustee's negotiations with JPMorgan, the Trustee and JPMorgan have entered into a certain Term Sheet (the "Term Sheet") attached hereto as <u>Exhibit "A"</u> and incorporated herein, detailing the essential terms of the proposed carve-outs.  In general, the Term Sheet provides:

---

[1] The JPMorgan claim has been asserted to the Trustee, but no formal proof of claim has been filed as of the drafting of this motion.

a. For sale of the Operating Assets, excluding Titled Assets[2], with 30% of the net proceeds, up to $1.2 Million to the Debtor's estate, plus 20% of the net proceeds after $1.2 Million;

b. For sale of the Titled Assets with 100% of the net proceeds to the Debtor's estate;

c. Division of the proceeds of Generac Lawsuit, the Orbit Lawsuit, the D&O Lawsuit, and any Tax Refunds with 30% of the net proceeds to the Debtor's estate, without monetary limitation; and

d. Division of any Employee Retention Tax Credit ("ERTC") with 50% of the net proceeds, up to $5.0 Million, to the Debtor's estate, plus 20% of the net proceeds thereafter, with a cap of $8.0 Million to the Debtor's estate.

11.    The Term Sheet further provides the Trustee with a certain defined period within which to object to JPMorgan's proof of claim, when filed, and reservation of the Trustee's rights to raise all objections to JPMorgan's proof of claim, including avoidance actions, during the defined Objection Period.

12.    Although the exact recovery to the Debtor's estate is yet unknown, the Trustee believes the carve-outs proposed by the Term Sheet will provide a significant and substantial return to the Debtor's estate for the benefit of its creditors.

13.    In negotiating the Term Sheet with JPMorgan, the Trustee further received an auction marketing proposal (the "Auction Marketing Agreement"), a copy of which is attached hereto as Exhibit "B" and incorporated herein, from Iron Horse Auction Company, Inc. for the

---

[2] Terms not specifically defined in this Motion shall have the meaning assigned to them in the Term Sheet.

liquidation of the Physical Assets.  The Auction Marketing Agreement provides, in general terms:

a.  Iron Horse and its Auction Affiliates will visit each of the Debtor's business locations to evaluate the Physical Assets for liquidation;

b.  Iron Horse and its Auction Affiliates will relocate the Physical Assets to a secure location so that the various leased may be rejected;

c.  Iron Horse and its Auction Affiliates will promote regional auctions with and advertising campaign cost not to exceed $5,000.00 per auction event;

d.  Iron Horse and its Auction Affiliates will conduct such auctions, fully accounting for the proceeds thereof, with commissions on a sliding scale from 15% down to 0% and with a Buyer's Premium of 15% on Titled Assets and 10% on non-Titled Assets.

## RELIEF REQUESTED

14.     The Trustee seeks approval of the Term Sheet and the Auction Marketing Agreement.

15.     The Trustee requests the authority to sell the Debtor's Assets free and clear of all liens and encumbrances, as-is, where-is, and without warranty.

### *Approval of the Term Sheet and Auction Marketing Agreement*

16.     In the Trustee's business judgment, liquidating the Debtor's Assets pursuant to the Term Sheet and Auction Marketing Agreement will yield the highest net return to the bankruptcy estate.

17.     Without the carve-outs provided by the Term Sheet, the Debtor's estate would likely be administratively insolvent.  However, with the carve-outs provided by the Term Sheet,

the Trustee believes there is a significant likelihood and probability that the Debtor's estate will

receive significant sums for the costs of administration and payment of claims herein.

18.     The compensation and commission structure of the Auction Marketing

Agreement is typical of those approved in other bankruptcy cases in this district.  *E.g., In re*

*Fusion Custom Trailers & Motorcoaches, Inc.*, Case No. 18-30445, Doc. 242 (Bankr. W.D.N.C.

March 4, 2019).

19.     The Auction Marketing Agreement requires no up-front expenditure of estate

assets.

### *Authority to sell free and clear of third-parties' interests*

20.     Section 363(f) of the Bankruptcy Code permits the sale of estate property "free

and clear of any interest in such property of an entity other than the estate, if  . . . (2) such entity

consents; … (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a

legal or equitable proceeding, to accept a money satisfaction of such interest."

21.     "In determining whether to approve a proposed sale under section 363, courts

generally apply standards that, although stated various ways, represent essentially a business

judgment test."  3 COLLIER ON BANKRUPTCY ¶ 363.02 (16th 2019).  Courts look to various

factors to determine whether a sound business justification exists, including: (a) whether a sound

business reason exists for the proposed transaction; (b) whether fair and reasonable consideration

is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d)

whether adequate and reasonable notice is provided. *Comm. of Equity Sec. Holders v. Lionel*

*Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (setting forth the "sound business

purpose" test); *accord In re Abbots Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986)

(implicitly adopting the articulated business justification test of *In re Lionel Corp.* standard and

adding the "good faith" requirement); *In re Charlotte Commercial Group, Inc.*, 2002 WL

31055241, *3 (Bankr. M.D.N.C. Aug. 12, 2002) (unreported decision by Judge Aron adopting

*Lionel* in the Middle District of North Carolina).

22.      By this Motion, the Trustee requests authority to sell the Physical Assets free and

clear of all liens, encumbrances, claims and interests by auction to be conducted by Iron Horse

Auction Company, Inc. and its subcontracted affiliates pursuant to the terms of the Auction

Marketing Agreement.  The Trustee further requests authority to execute and deliver such titles,

bills of sale, and other documents as may be necessary to convey the Physical Assets after

auction, without further motion or order of this Court.

23.      In addition, the Trustee requests authority to sell the IP Assets, free and clear of

all liens, encumbrances, claims and interests.  The Trustee proposes to sell the IP Assets by

negotiated offer(s) and subsequent motion(s) before this Court for final approval thereof.

24.      Other than the lien claimed by JPMorgan, the Trustee is aware of the following

liens evidence by UCC Financing Statements filed in the State of Delaware:

     a.   Wells Fargo Vendor Financial Services, LLC – "true lease" of 2018

Bobcat Mini Track Loader and 2018 Bobcat Auger – to the extent the

described assets remain subject to the "true lease" and are identifiable,

they will not be sold;

     b.   Hanwha Q Cells America Inc. – photovoltaic modules and related

equipment sold to Debtor – such assets are not readily identifiable to the

Trustee and, to the extent they remain in the Debtor's possession, are

commingled with other assets of like nature – such interest is in bona fide

dispute and the creditor could be compelled to accept money satisfaction

of such interest;

c. First-Citizens Bank & Trust Company (two UCCs) – "true  lease" of certain personal property/equipment – to the extent the described assets remain subject to the "true lease" and are identifiable, they will not be sold;

d. The Huntington National Bank – one Clark GTS30 Forklift, no serial number identified – such interest is in bona fide dispute and the creditor could be compelled to accept money satisfaction of such interest;

e. De Lage Landen Financial Services, Inc. – certain equipment leased or financed, contract number 500-50434313, no other identification – such interest is in bona fide dispute (possible preferential transfer) and the creditor could be compelled to accept money satisfaction of such interest;

f. SRS Distribution Inc. – "all tangible and intangible assets" - such interest is in bona fide dispute (possible preferential transfer) and the creditor could be compelled to accept money satisfaction of such interest; and

g. Arch Insurance Company – equipment, machinery, inventory, materials and proceeds – such interest is in bona fide dispute (possible preferential transfer) and the creditor could be compelled to accept money satisfaction of such interest.

25.    The Trustee is further aware that at least one, and perhaps others, of the various landlords claim or may claim statutory liens based upon lease defaults.  To the extent such statutory liens may exist, such liens are in bona fide dispute and the creditor could be compelled to accept money satisfaction of such interest.

26.    To the extent the liens described above, or such others as are unknown to the Trustee, are valid, the Trustee requests such liens to be ordered to attach to the proceeds derived

from the sale of the specific collateral securing such liens in the same order of priority as such liens exist in the asset(s) securing such lien.

27.    A sound business reason exists for the proposed sale in that this is a Chapter 7 bankruptcy requiring liquidation of the estate's assets.

## NOTICE

28.    Notice of Hearing on this Motion has been served on those parties set forth on the Certificate of Service filed herewith, which list includes (a) those parties who have filed requests for notices herein, (b) each of the various landlords known to the Trustee, (c) those parties known to hold claims or liens upon the Debtor's Assets as identified above, and (d) those counsel who have made appearances or requested notices herein and are registered users of the Court's CM/ECF noticing system.

## CONCLUSION

29.    The Trustee has exercised his business judgment to conclude that the Debtor's estate will receive the highest net benefit through the carve-outs agreed to in the Term Sheet, by auctioning the Physical Assets pursuant to the terms of the Auction Marketing Agreement, and by negotiated sales of the IP Assets.

30.    Accordingly, the Trustee requests the Court enter an order that:

       a.    Approves the Motion;

       b.    Approves the Term Sheet;

       c.    Approves the Auction Marketing Agreement;

       d.    Authorizes the as-is, where-is sale of the Physical Assets pursuant to the Auction Marketing Agreement, free and clear of all liens, encumbrances, claims and interests;

e.      Authorizes the as-is, where-is sale of the IP Assets pursuant to negotiated

offers and further motion(s) for confirmation of such sale(s), free and clear of all

liens, encumbrances, claims and interests; and

f.      Such other and further relief as the Court deems just and proper.

This the 1st day of December, 2022.

YOUNG, MORPHIS, BACH & TAYLOR, LLP

 /s/ Jimmy R. Summerlin, Jr.
Jimmy R. Summerlin, Jr.
N.C. State Bar No. 31819
P.O. Drawer 2428
Hickory, NC 28603
(828) 322-4663 telephone
(828) 324-2431 facsimile
jimmys@hickorylaw.com
Attorneys for the Trustee

**TERM SHEET**

EXHIBIT "A"

**Proposal re Sharing of Recoveries**

November 29, 2022

Pursuant to this Term Sheet (the "Term Sheet"), JPMorgan Chase, N.A., solely in its capacity as Administrative Agent ("JPM"), on behalf of the lenders (collectively, the "Lenders") under that Credit Agreement, dated as of November 23, 2021 (the "Credit Agreement"), and Jimmy R. Summerlin, Jr., solely in his capacity as Chapter 7 Trustee (the "Trustee" and, together with JPM, the "Parties") of the estate (the "Estate") of Power Home Solar LLC d/b/a Pink Energy ("PHS" or the "Debtor") agree as set forth herein.

WHEREAS, on October 7, 2022 (the "Petition Date"), the Debtor commenced its chapter 7 bankruptcy case in the Bankruptcy Court for the Western District of North Carolina (the "Court"), captioned as *In re Power Home Solar, LLC*, No. 22-50228 (Bankr. W.D.N.C.) (the "Chapter 7 Case");

WHEREAS, as of the Petition Date, PHS was party to the Credit Agreement, as borrower thereunder, pursuant to which the Lenders provided PHS with various lines of credit in the aggregate amount of approximately $80,000,000.00;

WHEREAS, in connection with the execution of the Credit Agreement, the Debtor executed the Pledge Agreement and the Pledge and Security Agreement dated November 23, 2021 (together, the "Security Agreements"), in JPM's favor in its capacity as administrative agent under the Credit Agreement.  JPM asserts that pursuant to the Security Agreements, the Debtor granted JPM a first-lien security interest in substantially all of its assets (the "Collateral"), securing the Debtor's obligations under the Credit Agreement.  JPM asserts it perfected its lien on the Collateral by filing financing statements as required by applicable law;

WHEREAS, JPM, as Administrative Agent under the Credit Agreement, is confident in the validity, perfection, and first priority of JPM's security interest in the Collateral;

WHEREAS, due to JPM's asserted security interest in the Collateral, the unsecured creditors of PHS are likely to receive nothing from the Estate as part of the Chapter 7 Case without an agreement between JPM and the Trustee;

WHEREAS, in order to create transparency and promote confidence by the creditors that issues in the Chapter 7 Case are being addressed in a fair and unbiased manner by the Trustee and/or the Court, JPM is willing to support the Trustee's efforts in maximizing the value of the Estate and share certain recoveries (the "Recoveries") as set forth below.

NOW, THEREFORE, the Parties hereby agree that the Trustee shall pursue the Recoveries—and the Parties shall share such Recoveries—in the manner set forth below:

| General Terms | |
|---|---|
| Definitions: | "Cash Collateral Stipulation" shall mean the *Stipulation and Agreed Order Authorizing Limited Use of Cash Collateral* entered on October 18, 2022, by the Court in the Chapter 7 Case [Docket No. 40].<br><br>"D&O Lawsuit" means any suit instituted by the Trustee, or any party on the Trustee's behalf, against the former members, managers, directors and/or officers of the Debtor in connection with the Chapter 7 Case.<br><br>"Generac Lawsuit" means the suit captioned *Power Home Solar, LLC d/b/a Pink Energy v. Generac Power Systems, Inc.*, No. 22-cv-00043 (W.D. Va.), initiated August 1, 2022 by the Debtor against Generac Power Systems, Inc.<br><br>"Operating Assets" means all equipment, inventory, accounts receivable, intellectual property, and other Collateral used or consumed in the day-to-day operations of the Debtor's business prior to the Petition Date.<br><br>"Orbit Lawsuit" means the suit captioned *Power Home Solar, LLC v. Orbit Marketing, LLC, et al.*, No. 1:21-cv-910 (SDMI), initiated by the Debtor against Orbit Marketing LLC, et al.<br><br>"Tax Refunds" means any amount due and owing to the Estate on after the filing of the Debtor's tax return(s) for any previous, current, or future tax returns on account of tax overpayments or tax credits.<br><br>"Titled Property" means any car, truck, trailer, or other vehicle owned by the Debtor as of the Petition Date which is required by law to be titled in an appropriate jurisdiction. |
| Operating Assets: | The Trustee shall retain Iron Horse Auction Company, Inc. and such other auctioneers[1] as the Trustee shall deem appropriate to assist in the liquidation of the physical Operating Assets and the Debtor's various intellectual property.  For all Operating Assets subject to liquidation by an auctioneer, Recoveries shall be shared in accordance with the following waterfall (each on account of each lot of such assets sold, unless stated otherwise):<br><br>   1.  Auctioneer expenses and commissions; |

---

[1] The Trustee's retention of auctioneers hereunder shall be subject to approval by JPM not to be unreasonably withheld.

| | |
|---|---|
| | 2. Applicable sales and other taxes to the liquidation sale; |
| | 3. Claims of landlords at the various locations, whose statutory liens are finally determined by the Court (or by agreement of the Trustee and JPM) to be superior to those of JPM's liens (if any), unless the Trustee is able to reach an alternative arrangement with such landlord(s) with respect to such liens/claims; |
| | 4. JPM on behalf of amounts advanced under the Cash Collateral Stipulation (if any) with regards to the liquidation of such Collateral; |
| | 5. For residual amounts remaining thereafter, a Recovery of 30% to the Estate and 70% to JPM until the Estate has received $1,200,000.00 in the aggregate on account of the Operating Assets (i.e., not on a lot-by-lot basis); and |
| | 6. For any residual amounts after the Estate has received $1,200,000.00 on account of the aggregate Operating Assets liquidated, a Recovery of 20% to the Estate and 80% to JPM. |
| | For any Operating Assets not subject to liquidation, Recoveries shall be shared 30% to the Estate and 70% to JPM until the Estate has received $1,200,000.00 aggregate on account of the Operating Assets (including amounts received pursuant to the terms of the foregoing paragraph), and thereafter, the Recoveries shall be 20% to the Estate and 80% to JPM. |
| Generac Lawsuit: | The Trustee shall engage, subject to Court approval, a reputable law firm (the "Outside Firm") to handle the Generac Lawsuit on a contingent fee basis, for which retention the Trustee agrees to confer with JPM and JPM shall have consent rights with respect to such retention, with such consent not being unreasonably withheld. Once such firm is identified, the Parties shall develop protocols for managing the Outside Firm to provide guidance and direction on litigation decisions.

Recoveries pursuant to the Generac Lawsuit shall be shared in accordance with the following waterfall:

1. Outside Firm's contingency fee and expenses plus any fees and expenses to any expert witnesses and other professionals necessitated by the nature and complexity of the Generac Lawsuit;

2. JPM on behalf of amounts advanced under the Cash |

|  | Collateral Stipulation (if any) with regard to paying any expenses and fees of the Outside Firm; and<br><br>3. For all remaining amounts, a recovery of 30% to the Estate and 70% to JPM. |
|---|---|
| Orbit Lawsuit: | Same as Generac Lawsuit; *provided*, *however*, to the extent no Outside Firm is retained, the Recoveries shall be split 30% to the Estate and 70% to JPM.  If the Trustee negotiates a settlement regarding the Orbit Lawsuit, such settlement shall be subject to JPM's approval not to be unreasonably withheld. |
| D&O Lawsuit: | Same as Generac Lawsuit; *provided*, *however*, to the extent no Outside Firm needs to be retained, the Recoveries shall be split 30% to the Estate and 70% to JPM.  If the Trustee negotiates a settlement regarding any D&O Lawsuit, such settlement shall be subject to JPM's approval not to be unreasonably withheld. |
| Tax Refunds: | For all Tax Refunds, a Recovery of 30% to the Estate and 70% to JPM, except that any Tax Refund attributable to any application by the Trustee on behalf of the Debtor for an Employee Retention Tax Credit ("ERTC") shall be divided as follows:<br><br>1. To the fees and expenses of Middlewarth, Bowers & Co., PLLC incurred by the Estate for the preparation of ERTC filings;<br><br>2. For residual amounts remaining thereafter, a Recovery of 50% to the Estate and 50% to JPM until the Estate has received $5,000,000.00 in the aggregate on account of the ERTC;<br><br>3. For any residual amounts after the Estate has received $5,000,000.00 on account of the ERTC, a Recovery of 20% to the Estate and 80% to JPM, until the Estate has received an $8,000,000.00 in the aggregate on account of the ERTC; and<br><br>4. For any residual amounts after the estate has received $8,000,000.00, the total remaining Recovery shall go to JPM.<br><br>For the avoidance of doubt, the Trustee's decision to seek or not to seek any portion of the ERTC shall be subject to JPM's consent, not to be unreasonably withheld.  Further, if and in the event any ERTC application is audited by the IRS or other agency with jurisdiction and such audit is finally determined to require that the Debtor/Estate repay all or any portion of the funds received by the Estate on account of the ERTC, JPM and the Lenders will indemnify the Estate |

| | |
|---|---|
| | for all amounts paid to them on account of the portion of the ERTC to be repaid in the same percentages as such funds were distributed as provided by the terms hereof.  For the avoidance of doubt, any such indemnification shall place the Estate and JPM in the same position as they would have been in under the terms of this Term Sheet had the portion of the ERTC not subject to disgorgement due to an audit been the original amount of the ERTC.  The Trustee's decision to consent to any final determination as to any audit shall be subject to JPM's consent, not to be unreasonably withheld. |
| Titled Property: | Each leasing company shall liquidate its respective inventory, with any residual amounts going to the Estate free and clear of liens of JPM.

For all Titled Property owned by the Estate, the auctioneer retained to liquidate Operating Assets shall liquidate all such Titled Property with Recoveries subject to the following waterfall:

1.  Auctioneer expenses and commissions;

2.  Applicable sales and other taxes to the liquidation sale;

3.  JPM on behalf of amounts advanced under the Cash Collateral Stipulation (if any) with regards to the liquidation of such Collateral;

4.  For all remaining amounts thereafter, 100% to the Estate free and clear of liens of JPM. |
| | Miscellaneous Terms: |
| Lenders' Claims: | JPM has provided relevant documentation and wishes to continue to evaluate whether filing proof(s) of claim is prudent.  Accordingly, JPM agrees to a limited reservation of rights.  The Parties agree that the Trustee must raise any issue with JPM's secured status and/or proof(s) of claim within the later of (i) 45 days of the date of the Court's approval of this Term Sheet or (ii) 30 days from the date the JPM files its proof(s) of claim herein (such period, the "Objection Period").  If the Trustee fails to raise such an objection before the expiration of Objection Period, such failure shall, except in the case of actual fraud, be deemed a complete and formal release of the Trustee's rights to object to the proof(s) of claim (including the secured status thereof) of JPM, the Lenders, and all Released Parties[2].  Such release shall also include any ability for the Trustee to object to, or seek subordination of, JPM's and the other Lenders' |

---

[2] As used herein, the term "Released Parties" shall include present and former officers, directors, executives, agents, attorneys, and employees, and all successors, predecessors, and assigns of each of the foregoing.

| | secured and deficiency claim(s) filed against the Estate (if any). If the Trustee formally lodges any objection to JPM's secured status or its filed proof(s) of claim during the Objection Period, the Recoveries to JPM due under the terms of the Term Sheet shall not be disbursed until such objection is finally resolved by the Court. |
|---|---|
| Lenders' Recovery: | JPM's recovery is limited to the full amount of its claim, plus contractually allowed default interest, and actual attorney's fees incurred by the various Lenders not to exceed 15% of JPM's aggregate claim amount. |
| Estate's Expenses: | For the avoidance of doubt, the proceeds received by the Estate hereunder shall be the sole contribution by the Lenders to the payment of Estate Expenses, and the Lenders shall bear no other costs with respect thereto unless expressly set forth herein. <br><br> As used herein, the term "Estate Expenses" includes all expenses of administering the Estate, including, but not limited to, those expenses related to the Trustee's fees, fees and costs related to Trustee's retention of counsel, payment of claims (administrative, priority, unsecured, etc.), and any other payments not specifically advanced by the Lenders under the Cash Collateral Stipulation in pursuit of the recoveries contemplated hereby. For the avoidance of doubt, Estate Expenses shall also include the commission due to any auctioneer(s) retained by the Trustee to liquidate assets and expenses not advanced by the Lenders in pursuit of the Generac Lawsuit, Orbit Lawsuit and/or D&O Lawsuit. <br><br> For the avoidance of doubt, nothing herein shall be construed as an agreement by JPM on behalf of the Lenders to advance amounts exceeding the $135,997.04 currently held by JPM as cash collateral (as such amount may be reduced by advances already approved pursuant to the Cash Collateral Stipulation). |
| Trustee's Reservation of Rights: | Subject to the limitations set forth in the section entitled *"Lenders Claims"*, above, the Trustee reserves all rights and remedies in relation to JPM and the Lenders and any proof(s) of claim that may be filed herein by either JPM or the Lenders, including, but without limitation, all rights and remedies under the Bankruptcy Code and/or Rules, and any other applicable federal or state law. Consistent with the purposes and intent of this Term Sheet, each of the parties hereto consents to the determination of any and all issues relating to the proof(s) of claim, including the determination of if and to what extent the proof(s) of claim may be secured by all or any portion of the Debtor's assets and/or whether any such alleged security interest is an avoidable transfer under the Bankruptcy Code and/or Rules or any other applicable federal or state law, by motion before the |

| | |
|---|---|
| | Bankruptcy Court and without the requirement of any party to file an adversary proceeding herein (although such right, together with all rights of appeal, is also preserved). |
| JPM's Reservation of Rights: | Unless otherwise expressly set forth herein, nothing in this Term Sheet shall be deemed a waiver or release of any rights of JPM in its individual capacity or as Administrative Agent under the Credit Agreement, nor shall it be considered an admission to any fact with respect thereto.  JPM reserves all rights, including, without limitation, to file one or more proofs of claim in the Chapter 7 Case, including, for the avoidance of doubt, any deficiency claim to which it is entitled, and pursue collection on such proof of claim as part of the Chapter 7 Case and/or defend itself against any action instituted by the Trustee. |

*[SIGNATURE PAGE FOLLOWS]*

Dated: 11/30/2022

/s/ _William H. Canney_

William H. Canney
Authorized Officer
Chase
611 Woodard Avenue, 2nd Floor
Detroit, Michigan 48226
Telephone: (313) 256-0517
Facsimile: (313) 256-0355

*Authorized Signatory on behalf of*
*Lenders to the Credit Agreement*

Dated: 11/30/2022

/s/ _Jimmy R. Summerlin, Jr._

Jimmy R. Summerlin, Jr.
Young Morphis Bach and Taylor LLP
858 2nd Street NE, Suite 200
Hickory, North Carolina 28603
Telephone: (828) 322-4663
Facsimile: (828) 324-2431

*Chapter 7 Trustee*

# Iron Horse Auction Co., Inc. EXHIBIT "B" 

Post Office Box 1267
Rockingham, North Carolina 28380

174 Airport Road
Rockingham, North Carolina 28379

Office: (910) 997-2248
FAX: (910) 895-1530

November 8, 2022

Mr. Jimmy R. Summerlin, Jr.
Young, Morphis, Bach & Taylor, LLP
North Park Building
858 2nd Street NE, Suite 200
Post Office Drawer 2428
Hickory, North Carolina 28603

RE:    Power Home Solar, LLC

Dear Mr. Summerlin,

I have reviewed the preliminary asset documents and debtor satellite locations that you have provided. I understand the provided documents are merely a percentage of the actual bankruptcy estate assets and locations. After a considerable amount of preliminary research and due diligence, I have prepared the following comprehensive proposal that will cover a brief background of my company, Iron Horse Auction Company, Inc. and MarkNet Alliance, then will progress on to the implementation of asset verification, recovery, potential relocation, and eventual liquidation of the estate assets. I will finish with a brief overview of the marketing of the liquidations and the proposed fee structure.

## **Background**

This proposal is intended to serve as an initial and preliminary resource for you as Trustee, the Secured and Unsecured Creditors and other Parties in Interest. Our firm was founded in 1983 by my father, William B. Lilly, and Thomas M. McInnis. Since founding Iron Horse Auction Company, Inc. ("Iron Horse"), we have located, recovered, and liquidated nearly a billion dollars in heavy machinery, vehicles, tooling, industrial manufacturing machinery and real property spanning from single family residential to heavy industrial sites. In 2007, my firm invested in and was a founding member of an auction company alliance that would soon become called the MarkNet Alliance. This was formed by multi-generational auction firms for situations such as the Power Home Solar case. Currently we have 76 member companies that conduct similar auctions in 26 states across the country. In addition to conducting similar auctions, we have proprietary software that controls our websites, bidding platforms, and allows us to share individual company's websites within the alliance. In September alone, our members sold $40,000,000.00 to 31,234 bidders in 381 auctions.



*Asset Recovery and Marketing Specialists*
*for America's Leading Corporations,*
*Professionals and Individuals*



## Implementation

We propose creating geographical divisions and assigning one auction firm affiliate ("Auction Affiliate") to manage each division. For illustration purposes, Iron Horse would manage the South Carolina, North Carolina, and Southern Virginia division.  Iron Horse would then identify an Auction Affiliate for the other divisions. Each Auction Affiliate will be managed directly by Iron Horse.  This will relieve the Trustee of having to manage multiple companies through this process and only have one point of contact.  Most divisions will span two or three states depending on the number of sites in each division. The Auction Affiliate will need to visit each location for assessment of assets.  This site visit will indicate if the site needs to be abandoned in its entirety to the landlord, or if substantial value remains onsite for an auction of the assets at that respective location.  At that time the Trustee and Iron Horse will decide the cost effectiveness of retaining the respective site.  Simultaneously, Iron Horse and the Auction Affiliates will be locating and relocating the leased vehicles and equipment to secured locations within each district. These locations could include Auction Affiliate yards and retained leased sites.

Once we have a better understanding of the assets to be administered, Iron Horse and the Auction Affiliates will begin preparing for disposition of the estate assets via online only auctions.  These auctions will occur as we prepare each site.  It is possible that each division will have multiple auctions.  Each auction will be managed by Iron Horse with the assistance of the locality of the Auction Affiliate.  This means that the auction catalogs will be uploaded by Iron Horse and all electronic payments will occur through Iron Horse's office in North Carolina.  In the event an Auction Affiliate receives cash or check payments at an auction site, the Auction Affiliate will deposit those funds in their respected custodial trust account and then electronically transfer those funds to Iron Horse within 10 days of the end of the auction.  All auction proceeds will be deposited in Iron Horse's custodial trust account with Fidelity Bank NC, a privately owned subsidiary of First Citizens Bank & Trust Company.  Auction settlement reports will be generated for each auction Iron Horse, or an Auction Affiliate conducts.  Those reports and respected auction proceeds shall be delivered to the Trustee within 30 days from the conclusion of the respected auction.

## Marketing Overview

This is a very complex matter and to generate a sufficient crowd of potential buyers, extensive marketing and promotional campaigns must be created and implemented.  Iron Horse owns its own advertising agency called Auction Promotions Unlimited, LLC ("APU"). APU will generate and place the advertising for all the individual auctions. Our advertising campaigns will include the use of the following means of advertising:

- A press release to introduce all the auction events to the media in the respected divisions and the national media markets.  APU will produce the press release to place a

positive spin on the auction events, and to generate as much free press as possible;

- We will produce a two-page full color brochure that will contain general information for the auction events and specific information of the assets to be sold.  We will distribute the brochures as deemed necessary in the individual divisions.  We will utilize Auction Affiliate prospect listings, as well as our own proprietary databases;

- The auction events will be placed on Iron Horse and Auction Affiliate websites, where an extensive amount of detailed information, photos, and bidding applications will be available.  In addition to our websites, the events could be listed on up to 76 auction related websites;

- We will erect custom prepared multi-colored billboard type signs located at and leading to the auction sites as allowed by local zoning and property owners association regulations;

- Our campaign will continue with digital and print national, state, and local newspaper advertising.  We will also advertise with the related trade association publications and websites;

The cost of the advertising campaign is an expense of the Bankruptcy Estate and shall not exceed $5,000.00 per auction event.  APU is prepared to advance the cost of the advertising and receive reimbursement from each auction settlement. The stated advertising fee covers the above referenced advertising, plus the layout and design of the brochures, digital and print ads.  Any funds expended over the per event budget amount shall be the expense of Iron Horse.  A full accounting of all per event advertising places will be provided with each settlement statement.

## Proposed Fee Schedule

As previously stated, this is a comprehensive proposal on a very complex matter with many unknowns currently.  I have researched other large-scale liquidations that Iron Horse has performed in this district as well as the Middle District of North Carolina.  This case can be considered as an extraordinary circumstance based on the various locations of the assets.  I feel that an alternative fee structure is applicable in this matter and would like to offer the following schedule:

We propose to offer a sliding commission scale of FIFTEEN PERCENT (15%) on individual lots that sell for 0.00 to $5,000.00; TEN PERCENT (10%) on individual lots that sell for $5,000.01 to $20,000.00; FIVE PERCENT (5%) on individual lots that sell for $20,000.01 to $50,000.00; ZERO PERCENT (0%) on individual lots that sell for anything over $50,000.01.  Iron Horse would not charge any commission on the vehicles and work

solely from the Buyer's Premium described below.  The commission is paid the Bankruptcy Estate and is deducted from the sale of each lot in every auction.

We propose to charge a Buyer's Premium of FIFTEEN PERCENT (15%) on the titled vehicles and trailers and Buyer's Premium of TEN PERCENT (10%) on the none titled lots that are sold. Buyer's Premium is a percentage added to the final bid price of each item or lot. The Buyer's premium is paid by the buyer of each item/lot.

As a new requirement, we will be required to collect and remit local sales tax to each taxing authority where an auction is conducted.

As with all bankruptcy auctions, there will be administrative expenses associated with the administration of the estate assets.  These include but are not limited to locksmith, light mechanic work, batteries, moving, hauling, storage lot fees and GPS vehicle monitoring fees.  Iron Horse is prepared to advance these fees to the estate with reimbursement at settlement with receipts.

All the fees stated above cover the cost of asset verification, recovery, and liquidation. The fees cover the cost of going to each site, milage, auction setup labor, auction inspection labor, auction item checkout labor, cataloging of each auction, professional photography of auction items, travel to and from locations, currency transfer fees and vehicle title document fees.

Iron Horse currently carries a $1,000,000.00 bankruptcy bond in the Western District of North Carolina.  We are prepared to obtain any additional amount necessary as may be required by the Court.

In conclusion, our comprehensive asset proposal is a program that we have implemented many times before and this method of verification, recovery and liquidation is an accelerated marketing program that is best suited for the bankruptcy estate.  I am prepared to speak with you or any party in interest about any questions or concerns they may have.

Kindly I Remain,

William B. Lilly, Jr.